Good morning. You may be seated. Welcome to the Fifth Circuit. I have the privilege of sitting on this panel with Senior Judge Grady Jolly and my colleague Judge Andrew Oldham. This is the first day of a four-day sitting for this panel. We will begin with two cases today. I will tell you at the outset, counsel, that you should assume that we have read your briefs, we're familiar with the arguments made in it, and we're also familiar with the significant case law that you've cited in the brief. I would also remind you of our timing system here. You all may be familiar with it. If you're not, the green light will go on when you begin. It will turn to yellow when you have two minutes left on your primary argument, and then when it's red, we ask you to complete your sentence, and unless there's a question pending, to go ahead and conclude. You will not get the yellow warning on rebuttal, but you'll have the clock to look at. So we're going to go ahead and begin, then, with the first case today, which is United States of America v. Andrew O'Connor Garza. Mr. Cofer, if you'd like to begin on behalf of Mr. Garza. May it please the Court. The district court imposed sentences in count one and count two that were not authorized by law. The district court imposed two sentences that were beyond the statutory maximum, and although this is a matter of first impression, Mr. Garza is not asking the court to do something extraordinary. Indeed, the government is not offering an alternative analysis or approach to how to handle these two sentences as they relate to the enhancement under the Controlled Substance Act. The categorical approach is how we handle this kind of situation. And so under the Controlled Substances Act, as charged in this case, Mr. Garza's sentence was enhanced from five years to ten years on two counts, and it was using the definition, or I should say the term marijuana, in the enhancement provisions, whether he had a prior conviction. Now as we understand it now, marijuana includes marijuana and excludes hemp. His prior conviction from 2016 was a federal conviction and included trafficking in marijuana. Necessarily, marijuana in that context included what we consider marijuana now, but also hemp. So a fair reading of the judgment, the indictment, all of the papers from— What is the product from hemp other than marijuana? Fiber, generally, but also we are seeing it through, you know, strip centers everywhere. There are cannabis products that do not have the specific psychoactive component parts that are prohibited. So not only do we have the traditional rope and that sort of thing that we make from hemp, but there are also parts of the plant or derivatives of the plant that are being used for other purposes, flour, oils, things like that. And so— A well-utilized product. I think in many instances it is. And, you know, I think we're seeing, of course, the trend, the Agricultural Improvement Act of 2018 is just part of a larger movement related to marijuana, related to hemp. And so we use the categorical approach as it's laid out in Shuler, and that is instead of looking at a generic offense and then comparing all of the elements, we look at the specific element that's in question, and that would be marijuana in this case. Let me ask you, and you're making a technical argument about the statute, which I understand and certainly precede, I don't want to get too far ahead of you on here, but how do you get around the district judge's statement that in essence he would impose the same sentence regardless of an error in calculation, particularly that particular argument that you're offering to us now? First, there's just the issue that these are two illegal sentences, and that must be corrected in and of itself. But more than that, to your point, the district court arrived at its alternative explanation for its sentence based on the wrong guidelines. The district court dug in and said very clearly that this is not a five-year case based on the guidelines, and that completely ignores 5G 1.1 that says whenever you have a statutory maximum, the guideline is that statutory maximum. And so the court in essence not only said, I'm not going to pay attention to 5G 1.1, but also Congress has told us this is a five-year case. And so essentially the judge is saying, the district court is saying that he would ignore what Congress has told us and find a way around what Congress has valued this case at by sentencing this defendant more harshly on another offense. But is there anything that prevents the judge from making sentences consecutive? Is there any prohibition on that? I understand your argument that it's a way around in order to sentence to more time. But when you say it's illegal, is there a case that tells us that this is completely impermissible under these circumstances? The imposition of consecutive sentences is not illegal. The imposition of the specific sentence on counts one and counts two is. The problem is, aside from the disregard of the guidelines and what Congress has said that this offense is worth, Mr. Garza did not have a fair opportunity to litigate what essentially was a new PSR. At the very end, essentially in an effort to inoculate the judgment, after announcing the sentence, the district court just lays out a completely new analysis that's different from the PSR, conflicts with the PSR in many ways, and Mr. Garza was not given a fair opportunity. I understand, we expect defense counsel to make all of the contemporaneous objections, but I can tell you being in that kind of situation, that's just not practical to work through. And so, for those reasons, I think we have to correct the illegal sentence and we need to send it back, and actually I would prefer the court just to correct the sentence and make it five years, but I also understand that we can unbundle these and send it back so that the district court can do what it will with the instruction of the court. And the truth is, perhaps it will be a different sentence because counsel will make those arguments that Congress said this is five years, look at 5G 1.1, perhaps it won't. But nonetheless, Mr. Garza should benefit from a lawful sentence. The categorical approach, I don't know that there's much of a question about whether that is what should be applied in this case. We've only just mentioned it in Jenkins, in this court, but practically all of the other circuits that have talked about a felony drug conviction or felony drug offense have used the categorical approach, save one, the Sixth Circuit, which for some reason just said it wasn't going to. The cases that the government points to, Santillan, Diaz, those cases relate not to the element like in Shuler, which would be marijuana in this case, but rather to the length of sentence and categorizing those offenses as a felony. And so like in Diaz, they're saying that because the state court has changed the law, the state is essentially rewriting history for the federal court, and that's not what we're asking. Congress changed the law in this situation, and we're comparing this law as it is now and our understanding of marijuana to what Mr. Garza was convicted of. And I don't think that's a stretch in any way. The government also mentions the case that the Supreme Court is considering Brown and indicates that perhaps we should wait for guidance on that. But if you look at Brown, it's an ACCA case. It's also about when or which version of the Controlled Substance Act should apply because it incorporates, ACCA incorporates the entirety of the Controlled Substance Act. And so it's really a timing issue in Brown, whether you should apply the law at the time of offense, at the time of conviction, or at the time of sentencing. And I don't think beyond supporting the categorical approach, it informs the question before the court here. With regard to the first issue, the public safety exception, I think the government's brief and perhaps the argument's lost sight of one of the important issues to unpack in the public safety exception. And that is laid out in quarrels, the need for the answer to the questions. And so in this situation, we have law enforcement outside with Mr. Garza, and there is testimony from Macias at 545 that regardless of what answer Garza gave to the question about the firearm, the search, the protective sweep was all going to be conducted in the same way. The frame of law enforcement being at Garza's home is they were executing a search warrant. They were there to collect evidence. The district court focuses exclusively on whether this was a dangerous or volatile situation. And I think the district court really gets far from the facts and makes a lot of assumptions and draws a lot of hypotheticals. In fact, the district court on the first page of its order says that these law enforcement officers had to protect against an active shooter. There was nothing that suggested that was the kind of situation here. In fact, we had Mr. Garza was outside in cuffs talking to law enforcement. Some time has passed. His wife is inside. They know that. They're bringing her out. But during this time, the testimony is that law enforcement is standing around the front of the house. One of the officers is on their phone on the front porch of the house. None of the officers outside have their guns drawn. They're just standing around waiting for the search to be done. And they're asking some questions of Garza. Nothing indicates that objectively these officers thought that there was any kind of threat, but also their conduct certainly would suggest that their questions were not directed at alleviating some threat, but they were just gathering information. Counsel, when was the first time that the jury heard your client's answers to the question about the bedroom gun? Well, the first time they heard the truthful answer, about the truthful answer, was when the, when defense counsel asked and clarified. Right. And who was defense counsel talking to? Cumberland, I believe. And who was Cumberland? One of the law enforcement. Do you think it was Sergeant, I'm going to butcher the surname, but was it Macias? No, I believe Macias was first asked about it and testified about him lying about it, but it may well have come out in Macias, but in either event, the first time the jury heard about it was defense counsel asking a question about it. So can you help me understand, what would be the best case that you could point to? I realize there's no reply brief in this case, so this doesn't come up in your brief, it only comes up in the government's brief, so maybe you have a case you can bring up to us today that would tell us that we can review a point of error that is affirmatively brought up by defense counsel. Well, I think there's an absence of authority. What the government relies on in their brief are two instances. One is a Supreme Court case. Regardless, in either event, it left the question open. There was not a final ruling. I'm sorry, in the Supreme Court case in Long, there was not a final ruling as to whether the evidence was coming in or wasn't. The question was still open. Let me ask it this way. In your view, after defense counsel brings this up at trial, was the court, the district court, supposed to sua sponte, say, objection, I'm suppressing the statement? No. The district court had already made its decision that this was coming into evidence. I understand. But once defense counsel brings it up at trial, I'm confused as to how you could then come and bring it to us as a point of error. The reason we litigate these issues pre-trial is so that we know the rules of engagement. We are able to put on a defense knowing which evidence is going to be allowed and which evidence is going to be disallowed. But the government made the decision not to use it. Well, I don't know that the government did make that decision, but I do know that defense counsel elicited the testimony before the government did. The government, by not bringing it up later, said initially he lied to us about there not being any guns in the house. We asked him, were there any guns in the house? And so at that level, once the gun was introduced, made a liar out of him. So what kind of prejudice did that enhance? I mean, how did that affect the testimony? Well, when the testimony was elicited, it was in response or rather to counter that necessary inference that the government had created by making him out to be a liar. And so defense counsel is put in the position. That's my point. I mean, a guess is that it was either he was a liar or he was a criminal. Because if he didn't have the gun, then he was a liar. And if he did have the gun, he was a criminal. It just seemed to me kind of ironic, but he didn't testify. The fact that they demonstrated that he was a liar, he lied about the gun, had no effect on him because he didn't testify. That's right, Your Honor. I believe how the evidence comes out, who elicits the evidence, is an appropriate inquiry for harm analysis. But when we look at how the government then later uses the evidence and harps on it in argument and makes use of the evidence, emphasizes the evidence for their purposes, I think the harm analysis comes out in favor of Mr. Garza. I'll wrap it up there and save my remarks for rebuttal. Thank you, Counsel. You've reserved some time for rebuttal. We'll hear from Mr. McKay on behalf of the government. Good morning, Your Honors. I'm Brian McKay on behalf of the United States. Mr. Garza argues that a new trial should be had on Count 4 because a suppressible statement was used to convict him. But as this Court noted, that's entirely inconsistent with him having elicited that statement at trial. Counsel, I hate to interrupt so early, but since we're talking about this right now, did the government at any point during the trial, having prevailed on the previous motion to suppress, advise defense counsel, oh, by the way, we're not going to introduce that statement, we don't see the need for it as a matter of meeting our evidentiary burden? The record certainly contains nothing like that, affirmative statement, we're not going to use it, and to my knowledge that affirmative statement was never used. I'm looking at it from defense counsel's point of view where I have now filed a motion to suppress. It has been denied, so therefore it's something on the table of the building blocks that may be used to convict my client. So why would I not be allowed to use it affirmatively? And then since I preserved the issue for appeal by way of the motion, pretrial motion. Your Honor, I guess two points to that. One is, as Your Honor knows, a trial is not a scripted event. Evidence comes in, evidence doesn't come in. We often seek either suppression rulings or limine rulings ahead of trial on evidence that ultimately the government decides doesn't need to come in because of the way the evidence comes in preceding it before trial. And so just because the court made a pretrial ruling does not by any means signal that the government actually will use that evidence. I understand. It would be low-hanging fruit if the government had said at some point during trial, oh, by the way, forget about that. We're not going to use that because the defense counsel is sitting there thinking here it comes. It's going to come in sooner or later. So at this point, there's no harm. I'm speaking about just the waiver, not the substantive ruling on its admissibility. That's the only reason I asked. Certainly, and I recognize that. And the other thing I would say is that to move for a pretrial ruling, get an unfavorable one, and then say, well, I can use it now, as counsel did here, would be sword and shield use of a pretrial motion to say that I can get that, and then I can affirmatively bring it out and try to use it to, for example, blunt the questioning suggesting that he was being untruthful with police about the presence of a gun there. And counsel can certainly do that, but they do that with awareness. And I point the court back to page 595 and 96, where at the end of the pretrial, the suppression hearing, counsel was very well aware of what was at stake, not the entire case, not all of the evidence, but simply can the government use this against me in its case in chief? And yet didn't wait for that to see whether the government actually did, but instead tried to use it to his advantage, and it can't be that he is still preserved and then can come and ask for a new trial based on a statement that he brought into the record and brought before the jury. Turn it to the merits of— What is the prejudice to the defendant in this case when the government witness said he denied there was a gun in the house and later it turns out to be a gun in the house, and the government does not correct the error that he was a liar because he changed his testimony to admit that there was a gun in the house? I mean it just seems to me that the government was being too clever by half. I don't know. Well— That's the ultimate conclusion I would reach, but it kind of looks a little slicky to me. I would remind the court that this gun wasn't found sort of in the back of a cabinet in her nightstand, in which case if he had denied it, they would litigate the facts of did he know about it or not. This gun was found on the top of the dresser in that master bedroom, and even then after he had elicited the statement that he did acknowledge there was a gun, they still litigated whether it was surrounded by accoutrements of her, you know, her things or whether it was his, and they still litigated about whether or not it was her possession of the gun, that he just happened to live there, or that he possessed it as well. And I respect Your Honor's thoughts on it. The government made him out to be a liar. That is, he denied that there was a gun, and then the evidence showed there was a gun, but the government did not correct what ultimately became the fact, and that is that he acknowledged that there was a gun. And that was not, first of all, with the correct witness. That was Deputy Macias, who was testifying, and even he said, look, I don't know about this statement, and yet the defendant drug it out of him based on his knowledge from the suppression hearing. The DEA agent, Agent Cumberland, who would testify later, actually did testify to that, but again, that was cumulative of what Deputy Macias had already testified. Turning to the merits of the public safety exception, if the Court reaches it, I should conclude that the district court correctly held that the public safety exception applied, and there are three aspects of the brief that I want to amplify. The first is where these events happened. This was not simply Mr. Garza's home. This is where he conducted his drug business, and I would refer the Court to the search warrant affidavit beginning at page 243 of the record, where not in every detail, but it does summarize that for a time, investigators had watched his house. Through poll cam video, through direct surveillance, they knew that as regular course, Mr. Garza hosted other people who came to his house to conduct drug business. So when they showed up there to execute the search warrant, it wouldn't be unheard of. They would understand that there is a significant risk that other people engaged in drug activity would be there as well. Were they aware of, as I understand from your brief, there was a somewhat lengthy criminal history of the defendant? Were the officers that were assigned to execute the warrant aware of the prior history, or were they only aware of what was in the warrant application? Deputy Macias testified, and Agent Cumberland might have as well. I can't recall, but I'm certain that Agent Deputy Macias testified that in their pre-execution briefing, they had gone over the defendant's criminal history, and of course that would include prior drug trafficking activity, prior violence, arrests that included violence, including use of a shotgun to threaten somebody. That is part of Deputy Macias. The fact that they reviewed his criminal history is part of his testimony at the suppression hearing. So they knew this is a place we're going to where other people come to conduct drug business. Second, they would know, again referring back to the search warrant affidavit, that Ms. Ortiz, the person who's inside and unresponsive to police when they're trying to reach her, that she isn't a mere bystander in this. The search warrant affidavit details how, according to the sources, she accompanied him to out-of-state trips to obtain drugs. At least one episode in which poll cam video showed her pulling out of the trunk of a car what investigators believed were drugs to move inside the house. So, again, officers showing up that morning would have reason to believe that she is someone who facilitates his offense, who may be motivated to thwart, even through violence, to thwart police. And the third thing I want to amplify, based on this court's authority and other courts, is that the protective sweep had not yet been done. I think Mr. Cofer mentioned that police were there just to search for things, but as the record details and suppression testimony details, this is a two-stage event. The first thing that officers need to do is secure the scene, make sure everything is safe, and then that entry team moves out and the search team, then they can do their search through for items mentioned in the search warrant. But at the beginning, officers are there to make sure everyone is secure, everything is secure for the search team to go in. And that had not happened at the time that Agent Suarez asked that second time, as Ms. Ortiz was coming out of the house, whether there were any guns inside. And that is certainly not a bright-line rule. The district court understood that and said explicitly so in its thorough order. But that is a highly salient factor as to whether officers reasonably perceived a risk that they needed to mitigate in determining was anybody else inside, were there any firearms inside. Turning to the issue of sentencing, a few things I would point out. I certainly continue to encourage the court to, I think the most straightforward way of deciding this is on harmlessness. I want to update the court as to, from the time of briefing, I pointed the court to Brown, the Third Circuit's opinion that is now up before the Supreme Court on certiorari. Before Brown, the government argued that the relevant time of comparison of drug schedules was at the time of the instant federal conviction. Before the Supreme Court, it was argued last week, of course it's been briefed, the Solicitor General has taken the position that the relevant time period is actually the time of the prior conviction. And so I want to make sure the court is aware of that. Of course, Brown is an ACCA case. I do think that it likely will hold guidance in this situation as well. Given the indeterminacy, the uncertainty of that, I think the record is absolutely clear here. That the district court understood what it was doing and it wasn't simply, I want to push back on the notion that it was simply inoculating the judgment. This wasn't an afterthought by the court. At sentencing, the judge, as defense counsel was making his argument, the judge, correctly perceiving like what is the significance of all this, asked counsel, well, can't I simply, if the statutory maximum is lower, as you say, can't I simply run count one and two consecutive to reach the guideline sentence? Counsel thought that there might be a barrier to that. I think he was mistaken. The district court addressed that and it's not raised on appeal. So the court understood going into it, I could just do this instead of that, and after hearing argument, said I would do exactly that. The court was firm. The court was clear. There is nothing that suggests this was an afterthought, simply inoculating a judgment. As to the remarks about the court saying this isn't a five-year case, the court wasn't speaking about the statutory maximum. The court was talking about this is a district court who sentences more defendants in our district than I think by far any other district judge in our district. He's experienced. He understands what he is doing. He's looking at this for a recidivist drug trafficker who has a prior felony conviction for drug trafficking, who has a history of violence, who had intimidated, reached out to witnesses to intimidate them through others before, during, and after trial. The judge was saying this isn't a five-year case. You may argue that I should give you five years, but this is not a five-year case. He wasn't referring to a statutory maximum. He was looking at an entire sentencing package and saying this does not warrant a five-year sentence. So I don't think that comment in any way suggests that the district court was seeing himself as confined to a five-year statutory maximum. For these reasons, the government would ask the court to hold that the first issue is waived or alternatively affirm the district court in its thorough and well-reasoned opinion as to why the public safety exception applied. And with respect to sentencing to hold that error, if it occurred at all, and I don't believe it did, but if it did, it would have been harmless here. Thank you. Thank you, counsel. Mr. Cofer, you have five minutes of rebuttal time. First I want to address, I was not going to get too deep into the arguments on Brown that are before the Supreme Court, but it is worth mentioning that the government's position in Brown is that you should apply the Controlled Substance Act as it's incorporated at the time of the conviction for the predicate offense. But also the Solicitor General and the government take the position and make very clear that it's because it is a dynamic law, because it incorporates the Controlled Substance Act schedule that changes all of the time, and so each change would essentially lead to tossing out all of the previous convictions. And the Solicitor General makes very clear that with a static list like we have here where it lists marijuana, narcotics, depressants, that if it's a static list that you should not apply the same analysis. You shouldn't somehow say that the definition of marijuana back then is what we're going to use now. So the notion that it supports what the government is asking for in this matter, I think, is inconsistent with what was argued before the Supreme Court. Now, in the quarrels issue, in the public safety issue, the district court went through a lot of work in laying out a lot of factors, and each one of those, I believe the district court used hypotheticals. Essentially, this could have happened. This could have been going on. And that really contrasts with what the examination should be as it's laid out in quarrels. This should be an easy call. This should not be one that you have to tease out all of these different ideas to possibly support what law enforcement has done. It's supposed to be so clear, so easy that you just know it from your gut right away. And we see in the record the conduct of law enforcement. They're not acting in a way that would suggest they knew in their gut that there was some sort of escalating danger or that there was something that they were worried about really at all. And so when you look at the need for the question, whether there's a gun, asking a second time, and law enforcement saying, it really didn't matter what he said. We were going to conduct the search in the same way, the sweep in the same way. And then you also look at these factors laid out and how there's an inference attached to every one or a hypothetical attached to every one. In both instances, the district court's decision was not supported by quarrels. And so I believe the court should reverse the gun offense, send it back for a new trial, and I believe the court should reform the judgment on count one and count two to be five-year sentences. Alternatively, send it all back for resentencing. Thank you. All right. Thank you, counsel. Thank you for your arguments today and for your helpful briefing. The case will be taken under advisement and considered submitted. We have another case today. Counsel, if you'd make your way up.